# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

SONYA CHARMAINE HAWKINS,

        Plaintiff,

v.                                                          ACTION NO. 4:13cv15

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendant.


## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Sonya Charmaine Hawkins brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Ms. Hawkins's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Ms. Hawkins protectively applied for DIB and SSI on August 24, 2009, alleging

disability since January 31, 2006, caused by stroke, heart attack, memory loss, and breathing problems. R. 188-219.[1]   Ms. Hawkins's applications were denied initially and on reconsideration. R. 73-121.  Ms. Hawkins requested a hearing by an Administrative Law Judge (ALJ), which occurred on June 15, 2011. R. 41-72.  Ms. Hawkins, who was represented by counsel, and a vocational expert testified before the ALJ. R. 41-72.  During the hearing, Ms. Hawkins amended her alleged onset date to June 27, 2009. R. 50.

On June 23, 2011, the ALJ found that Ms. Hawkins was not disabled within the meaning of the Social Security Act. R. 19-35.  The Appeals Council denied Ms. Hawkins's request for administrative review of the ALJ's decision. R. 1-5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).  Ms. Hawkins timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g), and cross-motions for summary judgment have been filed. ECF No. 3, 12, 17.

## II. <u>FACTUAL BACKGROUND</u>

Born in 1967, Ms. Hawkins was forty-two years old in June 2009, her alleged onset date. R. 361.  She graduated high school and has a half-year of college education. R. 47.  She has past relevant work as a meat handler, meat packer, cafeteria worker, and cashier. R. 51-52.

A.    <u>Ms. Hawkins's Medical History</u>

Ms. Hawkins was admitted to the hospital on June 29, 2009 for acute cerebral infarction involving the right middle cerebral artery. R. 361-63. Her speech was slurred with mild right facial weakness. R. 362. No motor weakness was noted upon admission. R. 362. On June 30, 2009, mild weakness of the lower part of the face and trace weakness of the left upper and lower extremities were noted. R. 365. An MRI of the brain revealed some microvascular lesions and

---

[1] The citations in this Report and Recommendation are to the Administrative Record.

two somewhat larger strokes in watershed distribution around the right middle cerebral artery. R. 365. While hospitalized, her medical records of 2006 were reviewed, and showed that she had a myocardial infarction in 2006 with the placement of metal stents in the left anterior descending coronary artery with a recurrent infarction in the left anterior descending distribution. R. 362. A June 30, 2009 echocardiogram revealed mild concentric left ventricular hypertrophy, mild enlargement of the left atrium, normal systolic function, and no significant valvular abnormalities. R. 366-67.  A computerized tomography ("CT") scan of Ms. Hawkins's head and neck revealed no evidence of flow limiting carotid stenosis and no evidence of intracranial major branch vessel occlusion. R. 368.  Ms. Hawkins, who smoked one-half pack of cigarettes daily, was "counseled significantly and strongly about the need to quit smoking," to follow-up with her family physician, Dr. David Lorenzo, and to return to work in one week. R. 328, 360.

David Lorenzo, M.D., examined Ms. Hawkins on July 7, 2009. R. 419. The neurological examination revealed mild weakness of the left upper extremity, four out of five strength, and no edema. R. 419. Ms. Hawkins presented to Dr. Lorenzo's office on October 13, 2009 with complaints of sharp pain and numbness in her left hand and left ankle pain. R. 414. Dr. Lorenzo wrote that the Tinel's sign of the left hand was positive without swelling. R. 414. He prescribed a wrist splint, and noted possible arthritis in the ankle. R. 414-15.  He prescribed Acetaminophen 500 mg every six hours. R. 415.

Ms. Hawkins experienced a second stroke in September 2009, and experienced ataxia with associated dizziness. R. 345, 350, 370.  Examination revealed that Ms. Hawkins had minimal right-sided facial weakness, no focal weaknesses neurologically, balance difficulty, the inability to sit without falling to the side, and some residual weakness from her prior stroke. R. 346. A CT scan of Ms. Hawkins's head revealed no hemorrhage, no acute large vessel infarct,

and no acute abnormalities. R. 347-48, 351-52. Upon discharge, Ms. Hawkins was instructed to continue home health physical therapy and follow-up with her family physician, Dr. Lorenzo. R. 347.  She was provided with a rolling walker. R. 347.

In October 2009, Dr. Lorenzo prescribed a wrist splint and referred Ms. Hawkins for an EMG due to left hand numbness. R. 415. Also in October 2009, a repeat head CT confirmed left sided facial numbness for thirty minutes. R. 372.

Eric Goldberg, M.D., a neurologist with Tidewater Neurologists and Sleep Disorder Specialists, conducted an EMG of Ms. Hawkins' left upper extremity on November 11, 2009. R. 325. The EMG showed entrapment in the left median nerve at the level of the wrist affecting sensory fibers consistent with a diagnosis of mild left hand carpal tunnel syndrome, but showed no physiologic evidence of peripheral neuropathy or cervical radiculopathy. R. 325. He recommended consistent wearing of wrist splints at bedtime. R. 325.

On December 14, 2009, Ms. Hawkins reported to Dr. Lorenzo that the left sided weakness remained, as well as back pain that was aggravated by physical activity. R. 410. Examination revealed tenderness of the spine, negative straight leg raising, no edema, and four-out-of-five motor strength. R. 410-11. Dr. Lorenzo prescribed Robaxin 500 mg three times a day. R. 411.  He instructed Ms. Hawkins not to drive when taking this medication, because it could cause drowsiness. R. 411.

On January 22, 2010, Javier Amadeo, M.D., with Hampton Roads Neurosurgical & Spine Specialists examined Ms. Hawkins for low back and leg pain. R. 434. She reported weakness, trouble with coordination on the left side, feeling that she was leaning to the left, and numbness in her left hand. R. 434. Examination revealed mild left-sided hemiparesis; decreased pin-prick sensation throughout the left upper and lower extremities; and, 3+ increased reflexes in the upper

4

extremities with a gait that is a bit antalgic to the left. R. 435. Ms. Hawkins had a full range of motion that was somewhat painful, positive straight leg raising on the left, but negative on the right, and moderate left lumbosacral tenderness. R. 435. Ms. Hawkins had "a bit" of difficulty finding the right words, but no full-blown aphasia was found. R. 435.  Ms. Hawkins could ambulate independently. R. 435.  Dr. Amadeo ordered an MRI and x-rays of Ms. Hawkins's lumbar spine, referred her to physical therapy, and recommended that she see a neurologist. R. 435.

Ms. Hawkins was examined by Anthony Panettiere, M.D., with Hampton Roads Neurology on February 2, 2010. R. 431. She reported back pain, as well as weakness and numbness in the left upper and lower extremities. R. 431-32. Dr. Panettiere noted a narrow based gait, full range of spinal motion and extremity motion, normal facial movement and tone, and negative Rhomberg and Babinski reflex tests. R. 432-33.  Ms. Hawkins weighed 245 pounds and was 63 inches tall. R. 432. Dr. Panettiere noted that Ms. Hawkins was morbidly obese, needed to lose at least 100 pounds, and was encouraged to start a weight loss program. R. 433. Dr. Panettiere prescribed Zolpidem for a sleep study to check for an obstructive sleep disorder. R. 433.  Ms. Hawkins was continued on Aggrenox. R. 431, 433.

On February 26, 2010, Ms. Hawkins reported to Laura Badley, N.P., with Hampton Roads Neurosurgical & Spine Specialists, that she had throbbing pain in her back with intermittent shooting pain down the left leg. R. 437.  Ms. Hawkins told Nurse Practitioner Badley that physical therapy helped, that she felt better, and that her pain was reduced to a 3 or 4 out of 10 when she took Robaxin and Tylenol. R. 437. Ms. Hawkins reported that her pain increased with prolonged sitting or standing and decreased with reclining. R. 437. Examination revealed a steady gait, good right lower leg strength, good left leg strength with iliopsoas, ankle

dorsiflexion, and plantar flexion, and mild quadriceps weakness. R. 437. Nurse Practitioner Badley diagnosed lumbalgia and left lumbar radiculopathy. R. 437.

Dr. Amadeo's examination on March 10, 2010 revealed Ms. Hawkins had a normal and unassisted gait, and his review of Ms. Hawkins's clinical studies showed no evidence of stenosis, neural impingement, or instability of the lumbar spine. R. 430. Dr. Amadeo noted that physical therapy was helping. R. 430. An MRI of the lumbar spine showed some facet hypertrophy, but otherwise normal findings. R. 333, 430. X-rays of the spine revealed mild degenerative facet disease at L4-5 bilaterally, but no instability. R. 430. Ms. Hawkins was logical and coherent, with fluent speech. R. 430.  Dr. Amadeo had no clear explanation for Ms. Hawkins's leg pain, but noted that facet arthritis might account for her back pain. R. 430. Ms. Hawkins was not a surgical candidate and Dr. Amadeo referred her to pain management and long-term rehabilitation. R. 430.

On March 15, 2010, Dr. Lorenzo reviewed an x-ray of Ms. Hawkins's spine, which revealed arthritis. R. 408.  He noted that Ms. Hawkins was undergoing physical therapy. R. 408. Ms. Hawkins complained of pain radiating from the left buttock to her lateral hip, and  back pain that was aggravated by physical activity. R. 408. Dr. Lorenzo's examination revealed lumbar spine tenderness, no edema, left-sided weakness, and four out of five strength. R. 408. Ms. Hawkins denied medication side effects and Dr. Lorenzo continued her on Robaxin reiterating the caution against driving due to potential drowsiness. R. 409.

The same day, Dr. Lorenzo completed a Residual Functional Capacity Questionnaire in which he diagnosed Ms. Hawkins with cerebral vascular accident, hypertension, coronary artery disease, carpal tunnel syndrome, high cholesterol, and low back pain. R. 397.  He noted that her symptoms of left sided weakness, and hand numbness would frequently interfere with her ability

6

to perform simple work-related tasks. R. 397. He wrote that her medication can cause drowsiness, and that she would need to take unscheduled breaks during an 8-hour work day every two hours for fifteen minutes each. R. 397. Ms. Hawkins could sit for seven hours, stand/walk for one hour, occasionally lift twenty pounds, and frequently lift ten pounds. R. 397-98. Dr. Lorenzo wrote that the left hand could be used 20% of the time to grasp, turn, or twist objects, for fine manipulation, and for reaching; and, the right hand could be used 80% of the time. R. 398. He indicated Ms. Hawkins would be absent from work more than four times a month as a result of her impairment, and that she is not a malingerer. R. 397-398.

On April 2, 2010, James Darden, M.D., a state agency medical expert, reviewed Ms. Hawkins's file and opined that she could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; frequently kneel, crouch and crawl; occasionally climb ramps or stairs, balance and stoop; and, never climb ladders, ropes or scaffolds. R. 79-80. Dr. Darden concluded that Ms. Hawkins could perform her past relevant work as a cashier. R. 73-83. Four months later, Carolina Longa, M.D., another state agency medical expert, reviewed Ms. Hawkins's file and concurred with Dr. Darden's finding. R. 104-08.

Dr. Lorenzo noted on April 22, 2010 that Ms. Hawkins complained of depression, feeling sad, worsening sleep disturbance, decreased energy, and decreased appetite. R. 406. He gave Ms. Hawkins a psychiatric referral for anxiety. R. 406.

Five days later, on April 27, 2010, Dr. Lorenzo opined on another functional capacity questionnaire that Ms. Hawkins would require breaks every 2 hours during an 8-hour workday. R. 457. She could frequently carry ten pounds, was unlimited in her ability to sit during an eight-hour workday and could stand or walk less than two hours. R. 457.

On July 13, 2010, Ms. Hawkins reported that she had fallen three weeks earlier, hurt her back, and needed medication for back pain. R. 402. She continued to report depression with decreased energy and insomnia. R. 402. Examination revealed Ms. Hawkins had lumbar spine tenderness, no extremity edema, left-sided weakness, and four out of five strength. R. 403. Dr. Lorenzo continued Ms. Hawkins on Robaxin 500 mg for the back pain, Paxil 20 mg once a day for depression, and referred Ms. Hawkins to psychiatry for evaluation and management. R. 403.

Dr. Lorenzo completed a Medical Evaluation form from the Department of Social Services on July 13, 2010. R. 425-426. Dr. Lorenzo indicated that Ms. Hawkins was unable to participate in employment and training activities in any capacity for one year. R. 425. He further indicated that Ms. Hawkins was not to perform prolonged standing, walking, or heavy lifting, and that she had psychiatric limitations. R. 426. He listed the reasons for her inability to participate in employment as primarily cardiovascular accident, and secondarily coronary artery disease, chronic low back pain, depression, hypertension, high cholesterol and obesity. R. 426. He indicated that she had been compliant with treatment and that her condition interfered with her ability to care for her children. R. 426.

Raouf Gharbo, D.O., with Hampton Roads Neurosurgical & Spine Specialists, examined Ms. Hawkins on July 14, 2010, for chronic low back pain. R. 428. He noted that her Robaxin makes her sleepy, and that Vicodin helped her pain, which averaged 8 out of 10. R. 428. He wrote that she was gaining weight due to pain, inactivity, and sleepiness from the medication. R. 428. She also informed Dr. Gharbo that she had stress, nervousness, depression, anxiety, uncontrolled anger related to feeling overwhelmed due to her work and home situation, and difficulty staying asleep. R. 429. His examination revealed hyperreflexia in the left upper and left lower limbs, minimal left pronator drift, good strength but impaired balance, marked pain

behaviors to light touch in the lumbar spine, and pain with lumbar extension. R. 429. He stated that the exam was somewhat limited due to her obesity. R. 429. His impression was that she has chronic low back pain, mild facet arthritis at L4-5, and history of ischemic stroke with left hemisensory deficits. R. 429. He prescribed Zanaflex for the pain and spasticity, stating that he believed that the Zanaflex may cause less drowsiness than the Robaxin. R. 429. He prescribed physical therapy for her back and gait. R. 429.

In September 2010, Ms. Hawkins returned to Dr. Raouf complaining of left ankle pain of a three-month duration. R. 470. Ms. Hawkins had broken her left fibula one year earlier, and had a good recovery; however, her pain inexplicably began two to three weeks prior to her visit. R. 470. She walked with a cane for stability. R. 470. Dr. Raouf diagnosed mild musculoskeletal strain, and inflammation in the left ankle. R. 471. He noted that Ms. Hawkins had a good response to a nerve block in her right thumb, but she refused the same for her left ankle, opting for pain medication instead. R. 471. Dr. Raouf prescribed Naprosyn. R. 471. One week later, Ms. Hawkins returned and reported that Zanaflex improved her back pain and "TPI" improved her hand. R. 460. Dr. Raouf identified Ms. Hawkins's left ankle pain as Ms. Hawkins's primary complaint. R. 460.

Ms. Hawkins returned to Dr. Lorenzo in September 2010, for right shoulder pain. R. 483. Examination showed Ms. Hawkins had right shoulder tenderness and decreased range of motion with no swelling, and no edema in her extremities. R. 484. Robaxin was continued. R. 484. In November 2010, Dr. Lorenzo indicated that Ms. Hawkins needed a cane for daily use to assist with daily activities. R. 480.

On January 6, 2011, Dr. Lorenzo reported that Ms. Hawkins continued to have 4 out of 5 strength, left-sided weakness, lumbar spine tenderness, and no edema. R. 478. Ms. Hawkins

denied radiation of back pain, and stated it was aggravated by physical activity. R. 477.   On April 4, 2011, Dr. Lorenzo's examination revealed the same. R. 477-78.

      B.      <u>Administrative Hearing Testimony – June 15, 2011</u>

Ms. Hawkins was forty-four years old on the date of her hearing. R. 48.  Ms. Hawkins testified she lived with her twenty-three-year-old son, eighteen-year-old daughter and fifteen-year-old son. R. 47.  She was 5'3" and weighed two hundred and fifty-six pounds. R. 48.  Ms. Hawkins amended her onset date to June 27, 2009. R. 50.

Ms. Hawkins testified that she last worked as a meat packer. 50-51.  She also worked as a hot bar line server at Hampton University, at West taking orders over the telephone, and as a cashier at a grocery store. R. 51-52.  Ms. Hawkins stopped working after suffering a stroke. R. 53.

Ms. Hawkins suffered a stroke in June 2009 and another in August 2009. R. 53. Following her first stroke, Ms. Hawkins could not talk, and she still has trouble stuttering when she is excited. R. 53-54.  It took her six months to recover her ability to speak in the manner she was speaking at the hearing. R. 54.  Ms. Hawkins testified that she is left-handed, and that following the first stroke, her left side was numb. R. 54. At the time of her hearing, her left hand was still numb. R. 55.  She could lift a book with her left hand, but not a gallon of milk. R. 63. She does not have any trouble lifting with her right hand. R. 63.  She needs help with buttons and zippers. R. 64.

Ms. Hawkins's left leg is also weak and will give out. R. 55-56.  She has muscle spasms three to four times a week unless she takes her medication. R. 56.  Robaxin, which she has been taking since her stroke, keeps her from having muscle spasms. R. 56.  Robaxin also reduces her

back pain from an eight, on a scale of one to ten, to a two. R. 62. However, Robaxin causes drowsiness, and she sleeps for an hour after taking the medication. R. 56-57.

Ms. Hawkins testified that after her second stroke, she had trouble with memory loss and anxiety. R. 58. She also had to use a walker for four to five months, and thereafter used a cane. R. 66. She can walk without the cane on good days, which occur approximately four days a week. R. 62-63.

She testified that in a typical day, she reads a book and watches television, often while lying down. R. 59-60. She fixes dinner with the help of her daughter, and grocery shops once a month with the help of her son. R. 59-60. She stopped her social activities after her stroke. R. 61. During the hearing, Ms. Hawkins was rocking back and forth to help relieve back pain due to arthritis. R. 59. Ms. Hawkins also testified that she had been depressed for the two years prior to the hearing. R. 68.

Barbara Byers, a vocational expert, testified that work as a cashier and cafeteria attendant is light in physical demand and unskilled. R. 70. Meat packer and meat trimmer are medium unskilled work, and telephone solicitor is sedentary semi-skilled work. R. 70.

The ALJ asked Ms. Byers to assume a hypothetical individual Ms. Hawkins's age, education and work background who could "lift, carry, push, pull up to 20 pounds occasionally and 10 pounds frequently with the right upper extremity and less than five pounds occasionally with the left upper extremity; stand and walk two hours within an eight-hour work day with the aid of an assistive device and no more than 15 minutes at a time; sit six hours within an eight-hour work day and no more than one hour before alternating to standing for 15 minutes; avoid climbing, balancing, kneeling, crawling, and perform other posture movements such as stooping occasionally; limited to simple routine, low-stressed tasks; can use the left upper extremity no

more than 20 percent of an eight-hour workday for fine gross manipulation; can use the right upper extremity frequently," and asked if that person could perform Ms. Hawkins's past relevant work. R. 70-71.  The vocational expert answered that the hypothetical person could perform some cashier work, such as parking cashier, as that is generally performed in the economy. R. 71.  However, the vocational expert testified the hypothetical individual could not perform past relevant work if they would need to take fifteen minute unscheduled breaks every two hours, or would miss more than four times a month from work. R. 71-72.

## III.  <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589.

The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).   Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.   *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.   20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a

condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

   A.    ALJ's Decision – June 23, 2011

   In his June 23, 2011 decision, the ALJ found that Ms. Hawkins met the insured status requirement through December 31, 2014. R. 24. At step one of the five-step analysis, he concluded that Ms. Hawkins had not engaged in substantial gainful activity since June 27, 2009, the amended alleged onset date. R. 24.  At step two, the ALJ found that Ms. Hawkins had a number of severe impairments including residual effects of status post cerebrovascular accident, coronary artery disease, and obesity with lower back pain and arthritis.[2] R. 24. At the third step, however, the ALJ concluded Ms. Hawkins did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 26.

   The ALJ found Ms. Hawkins had the residual functional capacity (RFC) to perform "less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  [Ms. Hawkins] can lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently with the right upper extremity and less than five pounds occasionally with the left upper extremity.  [Ms. Hawkins] can stand and walk two hours within an eight-hour work day with the aid of a cane, but no more than 15 minutes at a time before sitting.  [Ms. Hawkins] can

---

[2] The ALJ found that Ms. Hawkins's mental impairments of anxiety disorder and affective disorder do not cause more than minimal limitation in her ability to work activities, and are nonsevere. R. 25.  In making this finding, the ALJ considered the four broad functional areas set out in the disability regulations. R. 25

sit six hours within an eight-hour work day, but no more than one hour before alternating to standing for about fifteen minutes. [Ms. Hawkins] must avoid climbing, balances, kneeling, and crawling, but can perform other postural movements on an occasional basis. [Ms. Hawkins] can perform fine and gross manipulations with the left upper extremity no more than 20 percent of an eight-hour workday, but can frequently perform fine and gross movements with the right upper extremity." R. 26-27.

At the fourth step, the ALJ found Ms. Hawkins was capable of performing her past relevant work as a cashier. R. 30. Based on these findings, the ALJ concluded that Ms. Hawkins has not been under a disability as defined by the Social Security Act, from June 27, 2009, through the date of the decision. R. 30.

Ms. Hawkins argues the ALJ (1) committed an error by relying on the testimony of a vocational expert at step four of the sequential analysis and by determining Ms. Hawkins could perform her past relevant work as a cashier without discussing the pertinent duties of Ms. Hawkins's past relevant work as a cashier, (2) failed to indicate the weight given to all relevant evidence in the record, (3) failed to give proper weight to the entire medical opinion of Ms. Hawkins's treating physician, and (4) failed to properly evaluate Ms. Hawkins's credibility. Pl.'s Mem. 13-22.

B.      Step Four of the Sequential Analysis

Ms. Hawkins asserts the ALJ failed to use proper procedure by relying on a vocational expert at step four of the sequential analysis, and by failing to discuss the pertinent duties of her past relevant work as a cashier. Pl.'s Mem. 13-14. At step four of the sequential analysis, the ALJ evaluates a claimant's RFC, and determines if the claimant can perform the duties of her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The claimant bears the burden at step four to

prove she cannot perform her past relevant work. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). Ms. Hawkins must "show an inability to return to her previous work (*i.e.*, occupation), and not simply to her specific prior job." *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983) (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)). The ALJ may rely on the general job categories of the *Dictionary of Occupational Titles* ("DOT") as presumptively descriptive of a claimant's prior work. *Id.* The procedure for determining ability to perform past relevant work is outlined in SSR 82-62, which requires the ALJ's decision to contain the following findings of fact: (1) the claimant's RFC; (2) the physical and mental demands of the past relevant work; and, (3) whether the claimant's RFC will permit the claimant to return to her past relevant work. SSR 82-62, 1982 WL 31386.

Ms. Hawkins cites the Fourth Circuit case of *Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir. 1987), in support of her assertion that ALJs are not permitted to rely on vocational expert testimony to conclude a claimant can return to past relevant work. Pl.'s Mem. 13-14. However, the regulations were amended in 2003 to allow the ALJ to rely on the testimony of a vocational expert at step four of the sequential analysis, and *Smith v. Bowen* has been superseded by the new regulation. 20 C.F.R. § 404.1560(b)(2) (2003) ("We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."); *Bottoms v. Colvin*, 4:12cv48, 2013 WL 5533708, at *4 (W.D. Va. Oct. 7, 2013); *Prim v. Astrue*, No. 7:07cv213, 2008 WL 444537, *7 n.5 (W.D. Va. Feb. 13, 2008) ("The SSA amended §§404.1560(b), 416.960(b) to clarify that the SSA may use the services of a vocational expert . . . at step four of the sequential evaluation process. That

16

being the case, the social security regulations have superseded *Smith*.").   Accordingly, the ALJ did not commit error in relying on the testimony of a vocational expert in determining Ms. Hawkins could perform her past relevant work.

Next, Ms. Hawkins alleges the ALJ's decision is not supported by substantial evidence due to the ALJ's failure to discuss what he considered to be the pertinent duties of Ms. Hawkins's past relevant work as a cashier. Pl.'s Mem. 14.   Ms. Hawkins relies on the case of *Parsons v. Apfel*, where the court concluded the failure of the ALJ to provide adequate discussion of the claimant's past relevant work as a "salesman" and "consultant" deprived the court of "a meaningful review of the ALJ's unfavorable decision at step four." 101 F. Supp. 2d 357, 362 (D. Md. 2000).   In *Parsons*, the claimant's uncontradicted testimony was that after his heart attack, he could no longer perform the travel and frequent lifting of heavy garment bags required in his past work as a salesman. *Parsons*, 101 F. Supp. 2d at 362.   He testified that he relied on his wife and son-in-law to do this part of the job, while he performed the work of a "consultant" in filling out the paperwork. *Id.*   The ALJ found Mr. Parsons could perform his past relevant work as a "salesman" and "consultant" as these jobs are performed in the national economy as outlined in the DOT. *Id.*   In reviewing the ALJ's decision, the court was "unconvinced" that the title "consultant" was an appropriate title for Mr. Parson's job for purposes of relying on the DOT." *Id.*   The court remanded the case to the ALJ to identify and describe the job duties for the positions he labeled "salesman" and "consultant," as well as to provide the specific DOT job titles and reference numbers on which he relied. *Id.* at 363.

The *Parsons* case is not controlling here where Ms. Hawkins makes no argument that the DOT title "cashier" does not accurately reflect the duties she performed during her past relevant work as a cashier.   In this case, the ALJ had Ms. Hawkins' Work History Report, where she

stated her cashier duties consisted of stocking shelves, ringing up purchases, bagging groceries, and "not much lifting." R. 264. With this information regarding Ms. Hawkins's past relevant work, the state agency examiners determined Ms. Hawkins could perform her past relevant work as a cashier. R. 82, 107. In addition, the ALJ consulted the Vocational Expert during Ms. Hawkins's hearing, who testified that Ms. Hawkins's past relevant work as a cashier "falls in the light physical demand level and is unskilled work." R. 69-70. When asked whether a hypothetical individual with Ms. Hawkins's RFC could perform the past relevant work of a cashier, the VE testified the individual could perform some cashier work, such as parking cashier, but not the full range of cashier work. R. 71. Based on this record, the ALJ found that the job of cashier is light, unskilled work, and that considering Ms. Hawkins's RFC, she is able to perform the duties of a cashier. R. 30.

The undersigned finds there is substantial evidence in the record to support the ALJ's decision, and a remand is not necessary in this case where Ms. Hawkins has made no attempt to overcome the presumption that the DOT appropriately states the exertional classification, light and unskilled, of her past work as a cashier.

C.   Assignment of Weight to the Relevant Evidence

Next, Ms. Hawkins argues the ALJ erred by failing to specifically discuss and assign weight to the treatment records of Dr. Panettierre, Dr. Amadeo, Dr. Gharbo, and Dr. Goldberg. Pl.'s Mem. 14-15. Ms. Hawkins notes that these four doctors are specialists whose findings were not inconsistent with those of Dr. Lorenzo, and it would be helpful to know the weight assigned to their medical evidence. Pl.'s Mem. 16. Defendant asserts the medical documents Ms. Hawkins is relying upon in this argument are directed at matters that are not at issue and are cumulative. Def.'s Mem. 15.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3).[3] The ALJ is required to explain in his decision the weight assigned to *all opinions*, including treating sources, non-treating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 416.927(e)(2)(ii) (emphasis added). Further, the ALJ should "'explicitly indicate[] the weight given to all of the *relevant* evidence.'" *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (emphasis added). Accordingly, "'[u]nless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Id.* at 236 (quoting *Arnold v. Secretary of Health, Ed. & Welfare,* 567 F.2d 258, 259 (4th Cir.1977)).

These four doctors did not offer opinions on whether Ms. Hawkins was disabled due to her impairments. Therefore, the issue becomes whether their treatment records were obviously probative such that the ALJ committed an error of law by not assigning the notes weight in his decision. The undersigned finds the ALJ did not commit error. Ms. Hawkins admits the treatment notes from these doctors do not conflict with the findings and conclusions of her treating physician Dr. Lorenzo, whose opinion the ALJ did weigh in his decision. Pl.'s Mem. 16.

---

[3] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

The ALJ is not required to separately weigh each treatment record in his decision, especially where the treatment notes are not in conflict with the medical evidence assigned weight by the ALJ, but are cumulative evidence on the same issue. *See Stewart v. Apfel*, No. 98-1785, 1999 WL 485862, *4-5 (4th Cir. July 12, 1999).   A review of the decision shows the ALJ appropriately considered the treatment notes of these four doctors in reaching a decision.

Ms. Hawkins first argues the ALJ erred by failing to assign weight to Dr. Amadeo's medical records, noting that facet arthritis may account for Ms. Hawkins's back pain and referring Ms. Hawkins to formal pain management and long-term rehabilitation (R. 430). Pl.'s Mem. 15.  In his decision, the ALJ specifically referred to Dr. Amadeo's treatment notes, found at Exhibit 6, stating, "[o]n April 27, 2010, the claimant exhibited a full range of motion, although somewhat painful, of the lumbar spine. Straight leg raising was positive on the left at 60 degrees and negative on the right.  There was moderate tenderness to palpation along the left lumbosacral area.  The Claimant exhibited mild left-sided hemiparesis, 4+ throughout.  Her gait was a bit antalgic to the left, but she was able to ambulate independently (Exhibit 6F, p. 8)." R. 28.  The ALJ also referred to Dr. Amadeo's notes in stating Ms. Hawkins's "back pain was managed with medication (Exhibits 1F, 2F, 4F, 6F, 8F, 11F, and 12F.)" R. 29.  Clearly, the ALJ considered Dr. Amadeo's notes in making his RFC finding.

Next, Ms. Hawkins argues the ALJ should have assigned weight to Dr. Gharbo's impression that Ms. Hawkins suffered from chronic low back pain, mild facet arthritis at L4-5, and a history of ischemic stroke with left hemisensory deficits. R. 429; Pl.'s Mem. 15.  Dr. Gharbo's treatment notes are part of Exhibit 6F referred to in the ALJ's opinion. R. 28-29.  The ALJ found Ms. Hawkins suffers from severe impairments including "residual effects of status post cerebrovascular accident . . . low back pain and arthritis . . . ." R. 24.  The ALJ included Dr.

Gharbo's diagnoses when assigning Ms. Hawkins's RFC.

Ms. Hawkins also argues Dr. Panettiere's notes, stating Ms. Hawkins had a narrow based gait and that she should be referred for a sleep study (R. 432-33), as well as Dr. Goldberg's diagnosis of mild left hand carpal tunnel syndrome (R. 325), should have been assigned weight by the ALJ. Pl.'s Mem. 15.  The ALJ discussed Dr. Panettiere's notes from an examination on September 8, 2010, stating "Ms. Hawkins reported left ankle pain and stated that she was using a cane for stability.  However, on examination, her lower extremity strength was noted to be symmetric and normal for her age.  Her gait was antalgic.  The claimant was given Naprosyn for her ankle pain (Exhibit 11F, pp. 2-3)."  R. 28.  Similarly, the ALJ discussed Dr. Goldberg's diagnoses of mild carpal tunnel syndrome, "[a]n EMG from November 11, 2009 showed evidence of mild left hand carpal tunnel syndrome. There was no physiologic evidence of peripheral neuropathy or cervical radiculopathy (Exhibit 1F, p. 8)." R. 28.  Other than to state that the treatment records of Drs. Panettiere and Goldberg bolster those of Dr. Lorenzo, Ms. Hawkins does not indicate why the ALJ should be required to specifically assign weight to each of these treatment notes.  Pl.'s Mem. 15.

The treatment notes from these four doctors were considered by the ALJ, and specifically discussed in the ALJ's decision.  The diagnoses contained in the treatment records are consistent with those of Dr. Lorenzo, whose opinion the ALJ assigned weight.  Therefore, the ALJ was not required to assign weight to each of these treatment notes separately, and failure to do so does not constitute error.

      D.      Assignment of Weight to Ms. Hawkins's Treating Physician, Dr. Lorenzo

Ms. Hawkins asserts it was error for the ALJ to assign great weight to the portion of Dr. Lorenzo's opinion supporting a finding that Ms. Hawkins was not disabled, while assigning no

weight or not assigning weight to other portions of Dr. Lorenzo's opinion. Pl.'s Mem. 16. Specifically, the ALJ did not indicate the weight assigned to Dr. Lorenzo's opinion that Ms. Hawkins would require unscheduled breaks every two hours and would be absent from work four times or more, and assigned no weight to Dr. Lorenzo's opinion that Ms. Hawkins was unable to work for one year. Pl's Mem. 16.  Ms. Hawkins asserts the ALJ did not state a valid reason for giving less weight to these portions of Dr. Lorenzo's opinion, which did not support the finding of not disabled. Pl.'s Mem. 18.  Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Following a discussion of Ms. Hawkins's medical record, the ALJ made the following findings with respect to Dr. Lorenzo's opinion:

> As for the opinion evidence, treating physician David Lorenzo, M.D., noted that the claimant could lift and carry up to 20 pounds and could stand and walk about two hours in an eight-hour workday with limited fine and gross manipulation ability with the left hand (Exhibits 3F, 7F, and 10F).  Dr. Lorenzo's assessments are generally supported by the objective clinical findings and course of treatment and are therefore given great weight (20 CFR 404.1527, 416.927 and SSR 96-5p).  However, Dr. Lorenzo's assertion that the claimant would require unscheduled work breaks every two hours and would be absent more than four times a month are not supported for a period of 12 continuous months.  Dr. Lorenzo noted that the claimant's medications can cause drowsiness, but the claimant denied side effects to Dr. Lorenzo (Exhibit 12F).  The claimant was also normal on physical examination except for 4/5 left sided weakness and lumbar spine tenderness.  These findings do not support the need for

> unscheduled work breaks or absence from work more than four days a month.
>
> Dr. Lorenzo also submitted a statement indicating that the claimant was unable to work for one year (Exhibit 5F).  This assessment is given no weight because the issue of ability to work is reserved for the commissioner and because it is unsupported by the medical evidence of record (20 CFR 404.1527, 416.927 and SSR 96-5p). The medical evidence of record documents only mild to moderate objective clinical findings and conservative treatment that does not support a finding of disability (Exhibits 4F, 6F, 8F, 9F, 11F, and 12F).

R. 29.  The ALJ concluded Ms. Hawkins retained the RFC to perform a reduced range of light work with several specific restrictions to address her impairments. R. 26.  The ALJ properly reviewed Dr. Lorenzo's opinion and assigned it weight.   Some portions of the opinion were assigned great weight, while others were either explicitly or implicitly assigned no weight.   The ALJ's finding that Dr. Lorenzo's opinion regarding work breaks and absences was unsupported for a period of 12 continuous months, is an implicit assignment of no weight to this portion of Dr. Lorenzo's opinion.   The ALJ explained why he found these portions of the opinion were entitled to no weight, and substantial evidence supports his opinion.

The ALJ discussed Ms. Hawkins's strokes in June and September 2009, resulting in mild left sided weakness. R. 27-29, 345, 361-63.  The ALJ discussed the CT scan of Ms. Hawkins's head following the second stroke, which revealed no acute abnormalities. R. 28, 347-48.  The ALJ also noted Ms. Hawkins was alert and oriented times four with good recall for recent and past events, and neurologically, no local weaknesses were apparent. R. 28, 346.  He noted minimal right-sided facial weakness and difficulty with balance and dizziness. R. 28, 346.

The ALJ next discussed that an EMG showed mild left hand carpal tunnel syndrome, but no physiologic evidence of peripheral neuropathy or cervical radiculopathy, and that she was treated with a wrist splint. R. 28, 325, 415.  He noted Ms. Hawkins reported low back pain

aggravated by physical activity, and was prescribed Robaxin. R. 28, 408, 410-11.  The ALJ summarized objective evidence of spinal tenderness, negative straight leg raising, no edema, motor strength of 4 out of 5, and a full range of motion, though with pain. R. 28, 403, 405, 408, 411, 419, 435, 478, 484.  The ALJ discussed an MRI of Ms. Hawkins's lumbar spine showing no significant disc protrusion and widely patent central canal. R. 28, 333, 430.  He noted she experienced left ankle pain, and was using a cane for stability, but an examination of her lower extremity was symmetric and normal for her age. R. 28, 470.  The ALJ discussed examinations in April 2011, which continued to show lumbar tenderness and 4/5 left sided weakness. R. 28, 478.  He discussed Ms. Hawkins's reports that her back pain improved with medication, and testimony that her medication reduced her back pain to a two on a scale of one to ten. R. 29, 62, 428, 437, 460.  The ALJ considered Ms. Hawkins's report that her daily activities consisted of cooking, reading, and watching television for prolonged periods of time. R. 29, 59-60.

Lastly, the ALJ considered the opinions of the state agency medical consultants that Ms. Hawkins could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; frequently kneel, crouch and crawl; occasionally climb ramps or stairs, balance and stoop; and, never climb ladders, ropes or scaffolds. R. 79-80.  The ALJ assigned these opinions moderate weight, finding "the medical evidence of record supports somewhat greater physical restrictions given the claimant's left-sided weakness." R. 29.

Based on the records reflecting mild to moderate objective clinical findings, conservative treatment, and activities of daily living that do not support a finding of disability, the ALJ concluded the record did not support the need for unscheduled work breaks or absence from work more than four days a month. R. 29.  The ALJ specifically made accomodations for Ms.

Hawkins's left-sided weakness, obesity, back pain, and arthritis in his RFC. R. 29-30.

The ALJ reviewed the record, weighed the evidence, and assigned Ms. Hawkins an appropriate RFC. Substantial evidence in the record supports the ALJ's findings with respect to Dr. Lorenzo's opinions, and Ms. Hawkins has failed to show any error requiring a remand.

E.  Evaluation of Ms. Hawkins's Credibility

Lastly, Ms. Hawkins alleges the ALJ failed to make proper credibility findings with respect to Ms. Hawkins's testimony. Pl.'s Mem. 18. The RFC determination must incorporate not only impairments supported by objective medical evidence, but also those impairments based on credible complaints made by the claimant. The ALJ uses a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

Social Security Ruling 96-7p states that the evaluation of a plaintiff's subjective complaints must be based on the consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings, (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; (3) statements from both the

individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of Plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

In making his credibility determination, the ALJ acknowledged that Ms. Hawkins's impairments could reasonably be expected to cause her alleged symptoms, but her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 27.[4] The ALJ considered the unremarkable objective evidence in the record, the conservative treatment Ms. Hawkins has received, the residual mild left-sided weakness following her strokes, her mild carpal tunnel syndrome, the relief from pain provided by medications, and Ms. Hawkins's daily activities. R. 27-29. The ALJ's analysis was appropriate under the relevant

---

[4] This final statement of the ALJ appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004); *Duff v. Astrue*, 5:11cv103, Dkt. No. 18, at *9 (W.D. Va. Nov. 30, 2012) (PACER) (Judge Welsh); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013). In and of itself, this language is problematic because it places the cart before the horse in terms of making an RFC determination with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."). However, in this case, "it is clear in the pages that follow the boilerplate language in this case, the [ALJ] considered the evidence of the record and provided sufficient support for both his RFC finding and his determination of plaintiff's credibility regarding the limiting effects of her condition."*Racey*, 2013 WL 589223, at *6. Therefore, no error of law occurred because the ALJ's provided significant discussion of the particular credibility issues.

Social Security Rulings. *See* SSR 96-7p, 1996 WL 374186, at *3, 20 C.F.R. §§ 404.1529(c), 416.929(c).  The Court finds no "exceptional circumstances" exist, in this case, that warrant reversing the ALJ's credibility determination. *See Edelco, Inc.*, 132 F.3d at 1011.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Ms. Hawkins's Motion for Summary Judgment (ECF No. 12) be DENIED; the Commissioner's Cross Motion for Summary Judgment (ECF No. 17) be GRANTED; and the final decision of the Commissioner be AFFIRMED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


                                    _____/s/_____
                                         Tommy E. Miller
                                   United States Magistrate Judge


Norfolk, Virginia
December 19, 2013